UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MEYERS DIVISION

Case No. 2:13-cv-00850-SPF-DNF

Martha Bauer,

    Plaintiff,

v.

Federal Deposit Insurance Corporation, as Receiver
for First Community Bank of Southwest Florida,

    Defendant.

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO THE FDIC'S MOTION FOR SUMMARY JUDGMENT

### I.    SUMMARY

The "FDIC's"[1] motion for summary judgment:

    (1) Lacks merit-legally and factually; and

    (2) Is a continuation of "the FDIC'S" bad faith claim handling, for which Plaintiff [2]

    should receive her motion response costs pursuant to Fed. R. Civ. P. 11, unless

---

[1] "The FDIC" is placed in quotes because the real defendant, as typical in liability cases involving insured defendants, is the defendant's insurance company, CNA. The FDIC, in its Motion for Summary Judgment, treats the files of CNA and its insured, the Bank, as documents not within its possession or control and acts as if it has no knowledge of those key files. In the FDIC's discovery responses, it refused to produce many documents or information on the ground that "such information or documents are not in possession of this Defendant."

1

Defendant withdraws its frivolous and false Motion for Summary Judgment after this, and a separate Notice to be served on Defendant's Counsel pursuant to Rule 11 b, of Defendant's opportunity to withdraw its Summary Judgment Motion and the false affidavit on which it is based.

This response Memorandum is comprised of two sections, each responding to one of the two separate parts of the FDIC's motion for summary judgment.

### II. PART 1-RESPONSE TO THE FDIC'S "FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES" MOTION.

#### A. Summary

Contrary to the FDIC's contention that Plaintiff Failed to Exhaust Administrative Remedies (hereinafter referred to as the FDIC's "FEAR" motion), Plaintiff plainly complied with all requirements of law with respect to exhaustion of administrative remedies. The FDIC's FEAR motion is no more than an on-going effort to exhaust Plaintiff's resources, a strategy which has already led to Plaintiff's first counsel withdrawing.

#### B. Facts With Respect to the FDIC's FEAR Motion

The claims at issue in this lawsuit were served on First Community Bank of Southwest Florida ("Bank"), and its insurer, CNA insurance Company ("CNA"), more than two years prior

---

[2] Plaintiff is a 59 year old unemployed breast cancer survivor of limited means. She is married to an air force retiree who has suffered two heart attacks and recently underwent surgery. She has suffered over $60,000 of medical costs, surgery, substantial pain and suffering and permanent partial disability as a result of the Bank's negligent failure to keep its parking lot in adequate repair.

2

to the FDIC becoming the Bank's Receiver. (Affidavit of Plaintiff, Exhibit 1 hereto[3]). After lengthy delay, on October 11, 2012, the Bank and its liability insurer, CNA, took Plaintiff's recorded statement in which she explained what had happened, how it happened, and how she was injured. (Exhibit 2). For example, in her Recorded Statement, Plaintiff testified that the accident happened on March 22, 2011, her fall was witnessed by one or two other people whose names were provided, she had informed the Bank of the accident that very day and the next day, and that the cause of the accident was that the asphalt of the Bank's parking lot collapsed under her step, causing her to lose her balance, fall onto the asphalt on her bare knees, and that she had undergone extensive physical therapy, surgery and pain as a result of the accident. (*Id.*)

This Statement of Plaintiff was in the Bank's files when the FDIC took over the Bank and assumed control over its records, and was produced by the FDIC in response to Plaintiff's discovery requests. *Id.*

After Plaintiff had reported her claim to the Bank in March 2011, the Bank's attorney referred Plaintiff's claim to its liability insurer, CNA, which opened a claims file, claim no. ADV 402277651. (Exhibit 3 ). The FDIC's files, as produced by the FDIC in discovery, reveal that the Bank or CNA had photographs taken, from their chosen perspective, of the location where the asphalt collapsed under Plaintiff's step (Exhibit 4).

After the Bank and CNA failed to grant or to deny Plaintiff's claim, despite expiration of the claims response time limits set forth in Fl. Stat. § 626.9541(i)(3)(c) and (e)[4] , Plaintiff's counsel on May 13, 2013, sent to CNA a detailed nine page long settlement demand letter, with

---

[3] Exhibit 1, Plaintiff's statement as recorded by CNA, appears to have been poorly recorded and transcribed, but still contains important information in readable form.

[4] CNA and the Bank violated Fl. Stat. § 626.9541(i)(Unfair Claims handling Practices) by failing to timely respond to Plaintiff's settlement demand letter and overall claim. (Indeed, neither CNA nor the Bank has ever responded to the merits of Plaintiff's Claim.)

additional pages of photographs. (Ex. 3.) Along with Plaintiff's recorded statement, photographs of the accident site and other claims documents, this letter was also in the FDIC's files when it became Receiver, and was again provided to the Receiver after its appointment. This letter sets forth in detail the basis for the Bank's liability, the Plaintiff's injuries, the more than $60,000 in medical treatments she had received, photos of the part of the asphalt parking lot which had deteriorated, causing it to collapse under Plaintiff's step, photos of Plaintiff's ankle after the surgery she required as a result of her accident injuries, the conclusions of Plaintiff's doctors as to Plaintiff's accident injuries, and her damages. Because the Bank and its insurer CNA failed to respond to Plaintiff's settlement demand within the time limits set forth in Fl. Stat. § 626.9541(i)(3)(c) and (e), Plaintiff decided to commence a lawsuit against the Bank.

However, before Plaintiff could file her lawsuit, the FDIC moved, on August 2, 2013, to impose a Receivership on the Bank. *See* FDIC's motion. On August 9, 2013, after the FDIC discovered the Bank's file regarding Plaintiff's personal injury claim against the Bank and its liability carrier, it sent Plaintiff a Notice, advising her to file an on-line proof of clam form-which Plaintiff did on August 18, 2013. *Id.*

The FDIC, as the Bank's lawful Receiver, "stepped into the shoes" of the Bank, and acquired all rights and property of the Bank as well as the Bank's liabilities. *See, e.g., FDIC v. North Savannah Properties, LLC*, 686 F.3d 1254 (11th Cir 2012); *Resolution Trust Corp. v. United Trust Fund, Inc.*, 57 F.3d 1025, 1031, 1036 (11th Cir. 1995).

One of the Bank's liabilities at the time the FDIC became its Receiver was the pending claim by Plaintiff, who was injured by the Bank's failure to properly maintain its parking lot. One of the Bank's assets at this same time was the liability insurance policy the Bank bought from CNA to cover it in the event of claims by members of the public, such as Plaintiff, who

claim injury through the Bank's negligent failure to properly maintain the safety of its premises. *See, e.g., FDIC v. St. Paul Companies*, 634 F. Supp. 2d 1213 (D. Colo. 2008)(FDIC acquires rights of failed Bank in liability insurance policies of such Bank); *FDIC v. Oldenburg*, 34 F.3d 1529, 1552 (10th Cir.1994)(accord).

    Within the US Eleventh Judicial Circuit (there being no US Supreme Court case on point), a party with a *pre*-FDIC Receivership claim is not necessarily required to re-file such claim with the FDIC after the FDIC has been appointed Receiver. The Eleventh Circuit Court of Appeals in *Aguilar v. FDIC*, 63 F.3d 1059 (11th Cir. 1995), held that *pre*-FDIC Receivership claims against a failed bank do not need to be re-filed with the FDIC. Instead, the FDIC may ask the Federal District Court for a stay to allow it to investigate and respond to a pre-Receivership claim. If the FDIC does not ask for such stay, it waives any claim of "failure to exhaust administrative remedies *See also*, e.g., *Iberia Bank v. Coconut 41, LLC*, Case No. 2:11-cv-FtM-29DNF (USDC, MDFL, 10/11/2011) and *U.S. Fire Ins. Co. v. Fleekop*, 682 S.2d 620 (Fla. DCA 1996)( Florida law).

    The rationale of *Aguilar* is particularly applicable in this case wherein the failed Bank and its liability insurance carrier had more than two years, prior to the Receivership, to investigate and respond to Plaintiff's claims. The Bank and its insurer were in possession of substantial files detailing Plaintiff's claims, her injuries and her damages. The Bank/CNA had taken Plaintiff's recorded statement (Ex. 2), had taken photographs of the defective asphalt in question (Ex. 4) had received Plaintiff's medical Records (Exhibit 5), and had received a nine-page long letter from Plaintiff's counsel explaining her claim (Ex. 3). Contrary to the FDIC's false and spurious affidavit, the FDIC had all of these facts in its possession during the time

allotted it under FIRREA[5] to examine Plaintiff's claims. (Indeed, although the FDIC has admitted that it had all of these files in its possession or control, it has the temerity to submit to a Federal Judge a completely falsified affidavit.)

Despite the holding in *Aguilar* and progeny, Plaintiff, in the spirit of caution, on August 18, 2013, re-filed with the FDIC her pre-Receivership injury claim against the Bank. (Exhibit 6). In filing her FDIC Proof of Claim, Plaintiff used the online Proof of Claim form the FDIC requested that she use. *Exhibit 1*. The FDIC's web site would not allow Mrs. Bauer to attach documentation, however, so she faxed and mailed, via Certified Mail, numerous claims documents to the FDIC. (*Id*.) Despite the FDIC's bad faith assertion in paragraph 11 of its sworn affidavit to this Court that the FDIC never received any medical records from Plaintiff, the FDIC, on August 29, 2013, sent Plaintiff an e-mail message (Exhibit 5), stating "Ms. Bauer – the claims agent has verified that medical records were received."

The FDIC admits in it affidavit that on August 19, 2013, it received what it refers to as "additional correspondence" from Plaintiff, and that Plaintiff's submission included "correspondence with the failed institution's insurance carrier." This correspondence with the failed institution's insurance carrier included the detailed nine page long letter from Plaintiff's counsel to CNA (Exhibit 3), which provides very detailed information about the accident, injuries, medical treatments, and damages in question. Of course, this letter was also in the files of the Bank and its insurance carrier, CNA, all along. The FDIC's false and misleading affidavit to this Court spews on and on about lack of information which was plainly in the FDIC's possession or control, and which is contrary to the FDIC's sworn statements to this Court..

---

[5] Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C 1811, et. seq.

The FDIC's false and misleading affidavit to this Court also fails to mention that on August 29, 2013, Plaintiff sent additional information to the FDIC through an e-mail message with attachments of that date (Ex. 7), and that on August 29, 2013, the FDIC signed a Certified Mail package delivery receipt, for a package of documents detailing Plaintiff's claims against the Bank/FDIC. (Exhibit 8)

The FDIC's acknowledgment (or contention ) that it engaged in no analysis of Plaintiff's claims and claims files as submitted to the Bank and the Bank's liability carrier reveals the bad faith nature of the FDIC's FEAR motion. If the FDIC actually had any interest in administratively examining Plaintiff's claims, then plainly it would have been interested in the Bank's claim to its insurance carrier, CNA, with respect to Plaintiff's injury claim, and the position of CNA as to such claims. What the FDIC has actually done is aided and abetted CNA in failing to respond to Plaintiff's claims within the time periods required by Fl. Stat. § 626.9541(i)(3)(c) and (e). If the FDIC has, as it suggests, taken no steps to pursue the Bank's liability insurance asset, then the FDIC has also plainly failed to do its job as Receiver.

In sum, Plaintiff clearly submitted to the Bank, to CNA and to the FDIC more than sufficient information for the FDIC to analyze her claims.

After Plaintiff re-submitted her claim to the FDIC, the FDIC denied her claim, but informed her that she had 90 days to re-assert her claims in Federal Court. *See* FDIC motion. The FDIC now claims that this was simply a misrepresentation-consistent with the FDIC's misrepresentations to this Court in its FEAR motion and supporting affidavit. Plaintiff's counsel is uncertain how the FDIC's admissions of repeated material misrepresentations to Plaintiff and to this Court are helpful to the FDIC's case.

In any event, within 90 days of being informed by the FDIC of her right to sue, Plaintiff filed and served upon the FDIC the instant lawsuit. *(Docket)*

In the FDIC's Answer and First Amended Answer, it did not claim that Plaintiff had failed to exhaust administrative remedies. *Id*. Instead, the FDIC's Answer claims that it was not on notice that the defective condition of its parking lot could have caused an injury to anyone. *Id.* Such defense would seem to be inconsistent with a defense of "failure to exhaust administrative remedies," since such remedies would be "futile" given the FDIC's defense that it (the Bank) was not negligent.

Nine months later, apparently as the FDIC's lawyers were dreaming up their frivolous FEAR motion for summary judgment, it moved to amend, and amended, its Answer to assert its FEAR defense. *Id.* The FDIC's FEAR defense is novel in numerous ways. First of all, it does not deny that Plaintiff *did file* an administrative claim with the FDIC within the required time period, that the FDIC considered and rejected Plaintiff's claims, that it advised her that she had a right to sue the FDIC within 90 days, and that she did file such lawsuit within 90 days. Second, the FDIC cites no precedent where a court has ruled that there was a failure to exhaust administrative remedies under such facts. Third, the FDIC cites to no statutes or administrative rules or regulations which required Plaintiff to submit more claim information than that she submitted herein to the FDIC. Fourth, the files reveal that the FDIC had more than sufficient information to fully consider Plaintiff's claims.

The sole "authority" cited by the FDIC is an unpublished California District Court case, which is inapposite on the facts, and which concludes by admitting that the Plaintiff therein might be best advised to appeal the Court's unique and fact specific ruling. In an attempt to create facts which the FDIC believes are similar to those in the unpublished California case it

relies on, the FDIC's lawyers then attempt to claim that Plaintiff did not respond to the FDIC's 8/22/13 letter vaguely requesting "any information she wished to submit in support of her claim." Actually, Plaintiff had already faxed and subsequently mailed substantial supporting documentation to the FDIC, including her counsel's detailed May 2013 letter to CNA (Ex. 3), specifying very clearly the nature of Plaintiff's claim.

The FDIC then attempts to read into the language of its denial of Plaintiff's claims that such language means that they may have ruled differently had more information been provided. (The form language of the FDIC's letter has been set forth in other cases[6], and has not heretofore been given such meaning.) However, the FDIC never asked to use the stay procedure outlined in *Aguilar v. FDIC*, 63 F.3d 1059 (11th Cir. 1995), to allow it to administratively further re-examine Plaintiff's claims. In addition, it seems difficult to imagine how the FDIC could properly analyze Plaintiff's claims without examining the Bank's files with respect to its claim against its liability insurer, CNA, and without pursuing the Bank's rights against CNA under the Bank's liability insurance policy.

The FDIC's false allegations of fact and law also ignore that the FDIC (Bank/CNA) is at the same time claiming that it (the Bank) was not negligent as to how it maintained its parking lot, and thus that any further administrative review by the FDIC would be futile.

The FDIC then attempts to spin away the problem that the FDIC informed Plaintiff that she had a right to sue the FDIC within 90 days of the FDIC's denial of her claim, and that Plaintiff timely did file exactly such a lawsuit. The FDIC claims that it was mistaken, and that it cannot waive a claim of failure to exhaust administrative remedies. However, the US Court of Appeals for the Eleventh Circuit has held that the FDIC can under certain circumstances waive a

---

[6] *See, e.g., Placida Professional Center, LLC v. FDIC*, Case No. 12-12204 (11th Cir. March 13, 2013)(Unpublished)

defense of failure to exhaust administrative remedies. *See, e.g., Aguilar v. FDIC*, 63 F.3d 1059 (11th Cir. 1995). *See also, e.g., McMath v. FDIC*, Civil Action No. 2:10cv21-SRW.(USDC, M.D. Alabama, Northern Division, March 31, 2011).

### C. Legal analysis with respect to the FDIC's FEAR Motion.

With respect to claims asserted against a failed Bank *after* the FDIC has become Receiver for such Bank, there is no dispute that such claims must first be submitted to the FDIC prior to the claimant commencing a lawsuit against the FDIC. The rationale for this "Exhaustion of Administrative Remedies" requirement is that a regulatory agency with specialized expertise should first be allowed to analyze claims within its area of expertise before such claims are submitted to litigation. *See, e.g., Matzke v. Block*, 542 F. Supp.1107 (D. Kan. 1982).

This underlying rationale is absent in this case because the FDIC's expertise concerns financial and banking matters, not personal injury claims such as those at issue in this case. The FDIC's apparent admission (or contention) that it did not examine the files of CNA and its insured Bank with respect to Plaintiff's personal injury claim reflects this lack of expertise in handling personal injury claims. It seems probable that the Bank's liability insurer, CNA, was and is more experienced dealing with personal injury claims than the FDIC. Moreover, CNA had more than two years prior to the Receivership to analyze and adjust Plaintiff's claims- more than the time allowed under Florida law to respond to such claims. Instead of wasting money on frivolous motions, the FDIC's time would have been better spent asking CNA why it had failed to respond to the claims of Plaintiff and its insured, the Bank.

In sum, although the United States Court of Appeals for the Eleventh Circuit has held that the exhaustion of administrative remedies requirement does not necessarily apply to *pre-FDIC*

*Receivership* claims such as those at issue in this case,[7] **Plaintiff herein did file her claims with the FDIC in a timely manner,** the FDIC examined and denied those claims, and Plaintiff then filed the instant lawsuit within the time-period which the FDIC informed Plaintiff that she had to commence such a lawsuit. Plaintiff has complied with all applicable Exhaustion of Administrative Remedies requirements.

The FDIC's FEAR motion appears to be based on a claim that the Plaintiff herein did not submit to the FDIC information sufficient to qualify as exhaustion of administrative remedies. The FDIC's novel contention is contrary to the facts, is unsupported by any legal precedent and is contrary to long-established rules of law with respect to the doctrine of exhaustion of administrative remedies.

The US Supreme Court has essentially overruled the judicially created doctrine of exhaustion of administrative remedies, and has held that such exhaustion requirement only applies to the extent that the statute relevant to the administrative agency in question sets forth such an exhaustion of remedies requirement. *See, e.g., Darby v. Cisneros*, 509 U.S. 137, 147 (1993). Following *Darby*, the United States Court of Appeals for the Eleventh Circuit has held that courts must not create exhaustion of administrative remedies requirements other than those which are required by the statutes applicable to the regulatory agency in question. *See, e.g. Aguilar, supra.* There are numerous FDIC cases wherein Courts have refused to create exhaustion of administrative remedies requirements which are not clearly set forth in applicable statutes. For example, in *FDIC v. Hickey*, 757 F. Supp. 1294 (EDNY 2010), the Court held that the Plaintiff's claims in his lawsuit were not limited by the amount of the claim which Plaintiff had submitted to the FDIC for administrative review. (Hickey had, in fact, not specified any

---

[7] *See, e.g., Aguilar v. FDIC*, 63 F.3d 1059 (11th Cir. 1995)

amount in its administrative claim before the FDIC). Even though the amount of a claim against the FDIC might seem to be a logical requirement for an FDIC administrative claim, the Court reasoned that the applicable statute set forth no such requirement, and therefore the Court had no authority to impose such a requirement.

There are no statues or administrative rules/regulations which support the FDIC's novel FEAR motion. Indeed, the unpublished California case which the FDIC claims supports its FEAR motion admits that there are no applicable statutes, rules or regulations which support the FDIC's exhaustion theory as asserted in that case, and the court cites no case law precedent for its unusual ruling either. The FDIC asserts that the Plaintiff in the case it relies on at least submitted an FDIC claim form, but fails to mention that such form was designed solely for claims by Bank Depositors, and had nothing to do with the type of claim the Plaintiff was pursuing in that case. Moreover, in its analysis of this California case, the FDIC contends that Mrs. Bauer never submitted any proof of claim form to the FDIC-a patently false assertion.

The sum total of the matter is that the FDIC has misrepresented the facts and the law to this Court, and adds on top of that a claim that it is acceptable for the FDIC to make misrepresentations to the public and to this Court. The FDIC's FEAR motion should be denied.[8]

### III. Plaintiff's Response to the FDIC's Motion for Summary Judgment on the basis that it was not negligent.

---

[8] The FDIC's misrepresentations to this Court, in a sworn affidavit, and its failure to disclose material information to the Court, are troubling, and should lead not only to denial of the FDIC's false and frivolous motion but also to Rule 11 sanctions against the FDIC. Unless Defendant withdraws it frivolous Motion for Summary Judgment and the false affidavit on which it is based, Plaintiff, an unemployed individual of very modest means, will respectfully request and move for an award of her attorney's fees and costs ($5,000) of responding to the FDIC's frivolous FEAR motion. *See* (attached) *affidavit of Gary Irwin in Support of Motion for Imposition of Rule 11 sanctions. (Exhibit 11 hereto)*

A. **Summary**

The FDIC's motion for Summary Judgment on the basis that it was not negligent lacks merit because, at minimum, there are material fact issues in dispute, including the key issue of whether the Bank exercised due care in maintaining its public invitee parking lot.

The FDIC misrepresents the nature of Plaintiff's claims. The FDIC's motion alleges that because the asphalt hole at issue was created by plaintiff stepping onto the deteriorated asphalt, with the asphalt collapsing under her, rather than being a pre-existing hole which Plaintiff stepped into, the Bank could not have been negligent. The FDIC's argument is without merit, and irrelevant to the key issue of whether the Bank met applicable standards of parking lot/asphalt surface maintenance due care.

Black Letter Florida law provides that, a property owner owes two duties to an invitee: (1) **the duty to use reasonable care in maintaining the property in a reasonably safe condition;** and (2) the duty to warn of latent or concealed dangers which are or should be known to the owner and which are unknown to the invitee and cannot be discovered through the exercise of due care. *Aaron v. Palatka Mall, L.L.C.*, 908 So. 2d 574, 577 (Fla. 5th DCA 2005). The open and obvious nature of a hazard may discharge a landowner's duty to warn, but it does not discharge the landowner's duty to maintain the property in a reasonably safe condition. *See Pittman v. Volusia Cnty.*, 380 So. 2d 1192 (Fla. 5th DCA 1980).

The Bank's Motion for Summary Judgment is based on the second tenant of Florida common law cited above (duty to warn). However, Plaintiff's liability claim is based on the first prong (duty to maintain in safe condition) of the common law duty of care to invitees**: "the duty**

**to use reasonable care in maintaining the property in a reasonably safe condition**." *Id.* Plaintiff contends that asphalt surfaces, such as the parking lot in question in this case, can be built and maintained such that the surface will not collapse beneath the foot of a 160 lb. pedestrian. Indeed, as Plaintiff's expert points out in his affidavit, (Exhibit 9 hereto), one of the applicable safety regulations requires that asphalt be built and maintained so that it can support at least 200 lbs. of weight per square foot. The Bank had failed to correct deterioration of the asphalt and its substrata, which deterioration had been caused in large part by the roots of a nearby tree, which caused the asphalt in the area in question to be unable to support the minimum weight load.

Plaintiff's expert, a highly experienced and accomplished architect, engineer and builder with thorough knowledge and experience with the applicable safety standards, attests that the asphalt and substrata in question in this case had deteriorated to the point of being in violation of applicable safety standards. A proper maintenance inspection of the section of asphalt in question would have revealed that the asphalt needed to be immediately repaired to remedy a dangerous condition. To put it simply, the asphalt collapsed under the step of the 160 lb. Plaintiff because it was in unsafe condition. The Bank's failure to correct this unsafe condition was negligent.

The contention that the FDIC is entitled to Summary Judgment on liability is ludicrous. If anything, Plaintiff is entitled to Summary Judgment in her favor on the issue of liability because the FDIC has failed to submit any evidence showing that it maintained its parking lot in accord with applicable safety regulations, whereas Plaintiff has submitted evidence showing that the Bank was negligent because it failed to maintain its parking lot asphalt in the safe condition required by applicable safety regulations.

The FDIC's motion for summary judgment on liability lacks merit because, at minimum, there are material fact issues in dispute on this question : **did the Bank maintain its public parking lot in a reasonably safe condition?**

"[I]ssues of negligence and probable cause are ordinarily questions for the jury if reasonable men can arrive at different conclusions..."*Olson v. Crowell Plumbing & Heating Co*., 48 So. 3d 139, 143 (Fla. 5th DCA 2010); *Cassel v. Price*, 396 So. 2d 258, 260 (Fla. 1st DCA 1981).

B.  <u>Facts with respect to the Bank's Negligence</u>.

Plaintiff, at the time of the accident in question, worked as a paralegal for a law firm which was located next to the Bank. *Exhibits 1 and 2.)* Per an agreement between the Bank and the law firm, the law firm was allowed to use a certain number of parking spaces in the Bank's parking lot. (Indeed, a sign in front of the Bank's Parking lot identified the lot as providing parking for the law firm Plaintiff worked for.) (Ex. 2) Plaintiff was one of the law firm employees who was allocated parking space in the Bank's parking lot. Exs. 1 and 2. The Bank was plainly aware that Plaintiff was using its parking lot on her work days at the law firm next door. Plaintiff fell along the normal and expected route between her employer's office and her parked car. *Id..and Exhibit 9.*

On March 22, 2011, Plaintiff was walking to her car in the Bank's parking lot, when the asphalt underneath one of her broke apart, gave way  and collapsed a bit tilting forward, causing her to fall violently forward onto the asphalt with her bare knees. *Id*. Another law firm employee was a witness to the fall. *Id.* A bank employee was nearby and may have also witnessed the fall. *Id.*

15

Unfortunately, the fall turned out to be a serious matter for Plaintiff, who incurred over $60,000 in medical treatment, extensive physical therapy and surgery, substantial pain and suffering and partial permanent disability as a result of the accident.[9]

Attached to Plaintiff's expert report are several pictures of the section of the Bank parking lot in question. (Exhibit 9) The relevant area in question can be identified in the photos as follows. Upon leaving the law firm where she worked, Plaintiff needed to walk across her law firm's small parking lot to a sidewalk, and make a 90 degree turn left. (*Exhibits 1, 2 and 9.*) The sidewalk in this area had been significantly uplifted by a large tree growing in the Median which separated the sidewalk from the Bank's parking lot next to it. Id. After a short walk on the sidewalk, Plaintiff needed to make a 90 degree left turn into the Bank's parking lot, and then a hard left turn to the driver's side of her car. Near the curb abutting this "walking U-Turn" which Plaintiff needed to make to get to her car, the asphalt was largely blocked from view, and had a number of cracks in it with some uplifting of the pavement. Plaintiff admits, as the FDIC claims, that there were no holes that she noticed, and that she did not step into a hole or directly onto one of the cracks. Instead, she stepped at the outside edge of the cracks in the asphalt as she turned toward her car , and the asphalt suddenly broke, gave way and caved in slightly , causing her to fall forward onto her kneecaps.

---

[9] Plaintiff had, a couple of years before, been diagnosed with breast cancer. She underwent chemotherapy and radiation therapy. The combination of cancer and the treatments for cancer are well-known to be hard on a person's physical constitution and can cause weakening of bones and ligaments. *See Plaintiff's affidavit*. A number of years prior to the collapse of the Bank's parking lot asphalt under her foot, Plaintiff had also been involved in two major car accidents, which did nothing to help her physical and medical health and strength either. *Id*. Whatever the reason may be, the evidence will show that the fall caused serious injury to Plaintiff. Her physical limitations, and her decision to pursue recovery for her injuries, also led to a dispute with her law firm employer, and termination of her employment. She remains unemployed.

The FDIC's motion assumes that the lack of pre-existing hole must mean that the Bank could not have been on notice of any problem with the condition of this section of the asphalt in its parking lot. The FDIC's contention is incorrect.

The affidavit of Plaintiff's expert, attached hereto, describes why the FDIC's theory lacks merit. The key problem at issue was that the roots of the large tree in the Median between the public sidewalk and the Bank's parking lot had caused uplifting of the asphalt and deterioration of the ground underneath the asphalt, rendering it incapable of bearing the weight it must be able to bear pursuant to applicable codes and safety standards.. Expert Zimmerman points out that there are well-developed and accepted standards for assessing when asphalt must be resurfaced, repaired or replaced, and that the Bank violated those standards.

The FDIC has submitted no evidence to the contrary. If anyone is entitled to Summary Judgment on Liability, it is Plaintiff . At minimum, the issue of liability is a material fact issue in dispute, on which summary judgment cannot be granted for the FDIC.

Attached as Exhibit 12, as an accompaniment to the affidavit of Plaintiff's asphalt expert, are excerpts from some examples of the innumerable articles supporting the conclusions of Plaintiff's expert. The Codes, Ordinances and building safety standards cited by Plaintiff's expert similarly establish standards designed to protect the safety of the public as they walk on surfaces such as the Bank's asphalt paved parking lot. See within Exhibit 9, e.g., Cape Coral Ordinance 28-09( adopting International Property management code, which provides that "all parking spaces shall be kept in a proper state of repair, and maintained free from hazardous conditions. "); Florida Building Code ("Walkways shall be stable, planar, flush, and even to the

extent possible. Walkway surfaces for pedestrians shall be capable of safely sustaining intended Loads."), *et. seq*. The Bank violated these minimum safety standards.

The Bank's liability appears to be clear, and is not contradicted by any evidence submitted by the FDIC. At minimum, these liability issues are fact issues which preclude summary judgment for the FDIC. Ultimately, the jury will need to consider the testimony of the experts, and the fact witness testimony regarding how the accident occurred and why. Discovery is also still on-going as to the Bank's knowledge of the deteriorated condition of its parking lot, the age of the lot, the normal schedule for repair and replacement and other such material fact issues.

None of this is a proper subject for Summary Judgment. The Bank's Motion for Summary Judgment on the grounds it could not possibly be negligent should be denied.


November 26, 2014



/s/ Gary Irwin
Gary Irwin, serving as Trial Counsel for Plaintiff
Fl. Bar # 18826
Gary Irwin & Associates, LLC
1415 Tiffany Lane, #1307
Naples, FL 34105
grirwinlaw@gmail.com
(305)490-2360

-and-

15735 17th Place N.
Plymouth, MN 55447
_____

<u>Certificate of Service</u>

I, Gary Irwin, FBN # 18826, attest that on,    November 26, 2014, I e-filed this Reply Brief with a copy to Defendant's counsel..

/s/ Gary Irwin

<u>Certificate of Font Size</u>

I, Gary Irwin, FBN # 18826, attest that this brief complies with this Court's Rules regarding font size and other requirements.

/s/Gary Irwin