UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARTHA BAUER,

    Plaintiff,

                          CASE NO.:  2:13-cv-00850-SPC-DNF

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for First
Community Bank of Southwest Florida,

    Defendant.

_____/

## SUPPLEMENTAL RESPONSE TO REQUEST TO PRODUCE

    COMES NOW the Defendant, FDIC, as receiver for First Community Bank of Southwest Florida, by and through the undersigned attorney and files this Supplemental Response to Request to Produce propounded by the Plaintiff, Martha Bauer, on or about March 14, 2014, as follows:

    2.    All statements made by the Plaintiff pertaining to or concerning the subject matter.

    **RESPONSE: Attached.**

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided by electronic mail on July 8, 2014 to:   Bill B. Berke, Esquire (berkelaw@yahoo.com; diane.berkelaw@yahoo.com; chris.berkelawfirm@yahoo.com).

                  LAW OFFICE OF MARK H. GARRISON

                  _____

                  Edward S. Leonard, Esquire
                  Florida Bar No. 0013675
                  Attorney for FDIC, as receiver for First Community Bank of
                  Southwest Florida
                  4631 Woodland Corp. Blvd., Suite 301
                  Tampa, FL 33614
                  813-880-5104 - Direct Line
                  813-880-5150 - Main Telephone
                  866-292-8652 - Facsimile
                  General e-mail:  thelawofficeofmarkgarrison@cna.com
                  Attorney e-mail:  edward.leonard@cna.com

E2893164/1134724761

# RECORDED CLAIMS STATEMENT

| Insured | | Claim No. | File Name |
|---|---|---|---|
| First Community | | E2893164 | cfl6w00143.dbw |
| **Name of Person Giving Statement** | | **Relationship to Accident** | |
| Martha Bauer | | Claimant | |
| **Date Taken** | **Date of Loss** | **Requested By** | |
| 10/11/12 | 3/22/11 | Gail Kish | |

COMMENT: Inaudibles due to static.

        Q:     Unidentified Female
        A:     Martha Bauer
        L:     Carlos, Attorney

Q:     [Inaudible] Thursday, October the 11th, 2012. The time is 2:35 p.m. Eastern Standard Time. [Inaudible] Martha Bauer, and her attorney, Carlos [inaudible].

L:     Yeah, you do.

Q:     [Inaudible.]

L:     Uh, me or my client?

Q:     Your client.

L:     My client is, uh, Marty Bauer. And her legal first name is Martha. And her last name is Bauer, uh, that'd be Bravo, alpha, uniform, echo, Romeo.

Q:     Okay. And Martha, can you give me your home address, please?

A:     227 Southwest 31st Avenue, Cape Coral, Florida  33991.

Q:     Okay. [Inaudible.]

A:     Married.

Q:     [Inaudible.]

L:     [Inaudible.]

A:     It's Charles [phonetic].

*[Handwritten note:] Apparently, taped recording was inaudible in many parts of the recording. Also, the tape was poorly transcribed.*

Page 2                                                        Claim Number:  E2893164

Q:      Same last name?

A:      Yes.

Q:      And are you employed?

A:      No.

Q:      Retired?

A:      Uh, absolutely not.

Q:      Unemployed?

A:      Yes.

Q:      Okay.  And is that because of a disability, or [inaudible]?

A:      No, it's because I was terminated from my employment due to this injury, that I sustained on
        your insurance premise.

Q:      Okay.  And what was your occupation prior to being terminated?

A:      [Inaudible] paralegal.

Q:      Paralegal?

A:      Certified, correct.

Q:      Okay.  Were you employed by a law firm?

A:      Yes.

Q:      [Inaudible.]

A:      Warchol, Merchant, & Rollings, LLP.

Q:      Spell that [inaudible].

A:      W-a-r-c-h-o-l, for Warchol, Merchant is spelled M-e-r-c-h-a-n-t, ampersand for and, Rollings is
        spelled R-o-l-l-i-n-g-s.

Q:      [Inaudible.]

A:      On or about January the 18th, of 2012.

Q:      What was the date of the [inaudible]?

A:      Uh, March 22nd, 2011.

Page 3

Q:      Okay. Where did the accident occur?

A:      On your insured's premises, on the par-, in the parking lot.

Q:      [Inaudible.]

A:      I don't have that in my possession, but it's Cape Coral, Florida, uh, their address was on Southeast 47th Terrace.

L:      Can I chime in, help you?

Q:      Sure.

L:      Um, [inaudible], it's gonna be, uh, 1645 Southeast 47th Terrace, Cape Coral, Florida  32904.

Q:      [Inaudible.]

A:      At approximately 5:05 p.m.

Q:      What was [inaudible]?

A:      I was going to my car after work.

Q:      [Inaudible.]

A:      In the bank's parking lot, or your insured's parking lot.

Q:      [Inaudible.]

A:      At the doors.

Q:      [Inaudible.]

A:      The law firm is next door to the bank, I could give you better direction that the law firm and the bank had an agreement for overflow parking for the law firm's employees. And that's my parking in your insured's parking lot.

Q:      [Inaudible.]

A:      No.

Q:      [Inaudible.]

A:      My first day of employment with the law firm.

Q:      [Inaudible.]

Page 4                                                          Claim Number: E2893164

A:    Uh, it was verbally, and also there was signs posted in your insured's parking lot that states that
      Warchol, Merchant & Rollings employees were permitted to park in the designated parking
      space.

Q:    How long [inaudible]?

A:    Every day that I was at work.

Q:    [Inaudible.]

A:    From 8:30 to 5:00.

Q:    And [inaudible].

A:    [Inaudible.]

Q:    [Inaudible.]

A:    On an average, I was hired initially as two days a week.

Q:    [Inaudible.]

A:    It was clear, dry, sunny.

Q:    [Inaudible.]

A:    I exited the front door of the law firm.  Proceeded to walk through their front parking lot, and to
      the left, into the designated city sidewalk, which led to, or right adjacent to, and into your
      insured's parking lot.

Q:    Okay.  Okay.  What happened next?

A:    I proceeded to walk to my car.  There was a portion of the asphalt in your street parking lot that
      became defective, broke loose, 'causing me to become extremely off balance.

Q:    Okay.  Okay.  Can you tell me the entire chain of events, kind of stopping, I don't know if you're
      done talking, or if you are waiting for me.

A:    I'm waiting for you to ask the next question.

Q:    Okay.  What happened after you became off balance, that [inaudible] finished your statement?

A:    Becoming on balance, I, the, the, fell.

Q:    You fell, okay.  And what happened next?

A:    Uh, there was an employee of the law firm who, uh, asked if I was all right.  And then I got up
      and proceeded to get into my car.

Page 5                                                              Claim Number: E2893164

Q:     Okay. And when you left, did you go to the hospital?

A:     I didn't. As a matter of fact, there was an employee of the bank who was exiting at the time of the occurrence. And I informed her, uh, the employee, of the fall. And then I went home.

Q:     Okay. Were there any witnesses?

A:     Uh, yes. The bank's employee, and then, uh, the law firm's emp-, one employee.

Q:     Okay. When I say witness, I need actual [inaudible] seen you fall. So both of these [inaudible] people saw you fall?

A:     I cannot say whether or not the bank employee actually saw me fall. As far as the law firm employee, uh, I'd say yes to that.

Q:     Okay. And who was that employee?

A:     Danielle Taves [phonetic].

Q:     I'm sorry?

A:     Danielle Taves

Q:     How do you spell the last name?

A:     T-a-v-e-s.

Q:     And do you have a phone number for her?

A:     542-0700.

Q:     What's the area code?

A:     239.

Q:     And what type of shoes were you wearing?

A:     I call them my breast cancer survival, uh, they were two and a half to three inch heels, non skid soles.

Q:     Do they still have the heels?

A:     I do.

Q:     Were any pictures taken?

A:     Of what?

Q:     The area where you fell.

Page 6                                        Claim Number: E2893164

A:      Yes.

Q:      And who took them?

A:      I, I have taken some.

Q:      And when did you take them?

A:      Uh, the next day, and the, Monday.

Q:      Okay.  And what caused you to fall?

A:      The defective asphalt breaking loose.

Q:      Okay.  What do you mean by defective?

A:      [Laughs.]  The asphalt broke.

Q:      Okay.  So...

A:      [Laughs.]

Q:      When did the asphalt brake, when you stepped on it?

A:      In that area, uh, or around that area, it was very, uh, defective, or broken.

Q:      Okay.  My question was when did the asphalt break, when you stepped on it?

A:      Yes.

Q:      Okay.

A:      And it, and there were areas that were definitely broken prior to, and had been broken.

Q:      How long had they been broken?

A:      All, uh, uh, there's just absolutely no way that I could, that I could answer that question.

Q:      Okay.  But you said they had been broken for, um, had you seen these broken areas before?

A:      Not that specific area, but in the first parking space, in the parking lot, it was extremely defective, the asphalt, is what I mean by that.  The asphalt was just, ex-, extremely defective, because of tree roots.  The tree roots had uprooted portions of your insured's parking lot, along with portions of the sidewalk, the city sidewalk.

Q:      And when did you take notice of this?

A:      I don't understand your question.

Page 7                                                      Claim Number:  E2893164

Q:      Well, you're commenting about the parking lot being defective, I'm just saying when did you notice that it's defective?

A:      That area, uh, the first parking spot, I had noticed d-, I had parked in, uh, I'm trying to get a location in my mind, so I could tell you. It's the southwest section, I had parked in that area for about four, four years, and had tri-, and had avoided that area.

Q:      Okay. And, um, did you have an option to park on the law firm's direct parking lot?

A:      Uh, I, I'm going to, uh, decline in answering that question.

Q:      Okay. And would you [inaudible], uh ...

L:      That's not relevant to the fall down.

Q:      It's not what, relevant to what, I'm sorry?

L:      It's not relevant to the fall down, the, the fact remains is that she is not a trespasser. She would be a legal invitee. I mean, she had permission to traverse your insured's lot. So w-, whether, uh, the law firm allowed parking on their own lot is clearly not relevant. What is relevant is this law firm, not, not my law firm, but another law firm in town had a, had a, a deal with the bank, to, they could use it. Marty Bauer was, uh, lawfully on your insured's lot. That's the end of that topic.

Q:      Okay. I mean, you, you can decline not to answer that, I don't, I don't see what the problem is with answering my question, but I mean, that's fine, we can move on.

L:      Yes, uh, we can move on. Uh, I, I'm here to help.

Q:      Okay. Not a problem.

A:      Right, uh, and, and the bottom law was that it was mandated by the law firm that I park in the, uh, parking, in the bank parking lot.

Q:      I'm sorry, it was mandated by the law firm that you park in the bank's parking lot, and not their parking lot?

A:      That is correct.

Q:      Okay. And you said this mandate was verbally, or was it written?

A:      Uh, I've already answered that question. It was verbally, uh, uh, I was verbally advised upon the first day of my employment, and also because of the signs that were posted in your insured's parking lot, that stated that parking spaces were for Warchol, Merchant, & Rollings. They ...

Q:      Okay. Were you carrying any-, uh, thing at the time you, it occurred?

A:      Yes.

　　　　　　　　　　　　　　　　　　　　　　　Claim Number:  E2893164

Q:     What were you carrying?

A:     A purse.

Q:     Is that it?

A:     No, I'm trying to think, so give me a moment, please.  It was a purse, a small tote, um, that had a one inch legal binder.

Q:     Okay.  Anything else?

A:     Not that I recall at this time.

Q:     Okay.  What direction were you looking when you fell?

A:     Straight forward.  And also down.  I, I do always walk, uh, watch where I walk.

Q:     And when you fell, how did you fall?  Was it [inaudible]?

A:     I fell on both my knees, my hands.

Q:     Anything else?

A:     And of course, my feet.  Probably my buttocks.

Q:     Have you ever been involved [inaudible]?

A:     Uh, y-, yes.

Q:     And when was that?

A:     Uh, approximately December of 2001.

Q:     What happened?

A:     I, uh, had attended the Christmas, uh, road show.  I'm trying to think back.  We're talking 11 years.

Q:     That's fine.

A:     And I was proceeding to go to the car, and it was, there were no lights in the area where I was walking.  And there was a great big, again, a parking lot.  And I fell.

Q:     [Inaudible.]

A:     Uh ...

L:     Yes.

A:      Yes.

Q:      Oh.  Okay.  Did you injure yourself in that fall?

A:      No.

Q:      What did you [inaudible]?

A:      I broke my fifth met-, my fifth metatarsal.

Q:      Like, [inaudible].  And what injuries did you, uh, [inaudible]?

A:      It would have been definitely both knees.  It was over, to keep this simple, it was overall, except
        for my neck.

Q:      When did you [inaudible]?

A:      I contacted my medical facility, or my doctor, the next day.  But they could not get me in until
        the following day, which was Thursday, March the 24th, 2011.

Q:      What sort of follow up, uh, [inaudible]?

A:      I, I can, give me one moment, I went to my primary care physician.  From there, I was referred
        to, uh, orthopedic surgeon, pain management.  I went through extensive physical therapy.  And
        subsequent, uh, right foot surgery.  With pain management, I underwent painful, uh, bilateral
        knee injections.

Q:      [Inaudible.]

A:      No, I'm still treating.

Q:      [Inaudible.]

A:      I'm currently, uh, receiving pain management, and have been scheduled for a nerve conduction
        test.  And also an MRI for the right foot.

Q:      Any other [inaudible]?

A:      Uh, that's been discussed, but we're waiting for the results of, of the MRI, and nerve conduction,
        so ...

Q:      [Inaudible.]

A:      No.

Q:      [Inaudible.]

A:      Yes, I did.

Page 10

Q:      [Inaudible.]

A:      No.

Q:      [Inaudible.]

[End of Recorded Statement.]